IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

TABITHA HARRIS                                                    PLAINTIFF

v.                              No. 2:11–CV–00194–BD

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

Tabitha Harris sought judicial review of the denial of her applications for

disability insurance benefits (DIB) and supplemental security income (SSI).[1] Ms. Harris

worked as a cafeteria manager for ten years, but the record does not explain why she

ceased working at that job.  Ms. Harris based disability on her back, bipolar disorder,

and drug abuse.[2]  Ms. Harris testified that she had a herniated disc and a bulging disc at

the site of an earlier back surgery.[3]  An MRI of Ms. Harris's spine, however, showed no

recurrent herniation and only a "slight" bulge at the site of the earlier surgery.[4]  The

---

[1] *See* docket entry # 2 (complaint).

[2] SSA record at p. 122.

[3] *Id*. at p. 34.

[4] *Id*. at p. 209.

bulge did not impinge on the nerve root so as to substantiate all of Ms. Harris's allegations.[5]

Medical records established diagnoses of bipolar disorder and polysubstance abuse, and indicated treatment controlled those conditions.

After considering Ms. Harris's applications, the ALJ found that although Ms. Harris had severe impairments—degenerative disc disease, post back surgery at the L4-5 discs, bipolar disorder, and polysubstance abuse disorder[6]—Ms. Harris had the residual functional capacity (RFC) to do sedentary work with specified exertional and non-exertional limitations.[7]  Because a vocational expert identified jobs a person with Ms. Harris's RFC could do, the ALJ concluded that Ms. Harris was not disabled under the Social Security Act.[8]  Ms. Harris has raised four arguments to challenge that conclusion.

---

[5] Rebecca J. Frey, 4 The Gale Encyclopedia of Med. 2645 (4th ed.) (describing how a herniated disc can pinch or irritate a spinal nerve and cause pain to radiate down the leg, as well as causing numbness and weakness).

[6] SSA record at p. 14.

[7] *Id*. at p. 15.  The limitations included the following: Ms. Harris could occasionally bend, stoop, and crouch, and never squat, kneel, or crawl.  She could understand, carry out, and remember simple tasks; use judgment to make simple work-related decisions; interact with co-workers on no more than an occasional basis; not interact with the general public; and deal with changes in a non-varying work setting.

[8] *Id*. at p. 21.

**Ms. Harris's RFC**.  Ms. Harris argues that the ALJ erred in determining her RFC because she could not sit to do sedentary work[9] and because the ALJ under-estimated the effect of her bipolar disorder.[10]  "In determining the claimant's [RFC], the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments."[11]

In this case, no competent medical evidence showed that Ms. Harris could not sit to do sedentary work.  Sedentary work ordinarily requires the ability to sit for "about 6 hours of an 8-hour workday."[12]  Ms. Harris never complained to physicians about the inability to sit.  In contrast, Dr. Brian Hunter observed that Ms. Harris maintained a seated position comfortably during his psychological examination.[13]  The MRI of Ms. Harris's back did not indicate Ms. Harris was unable to sit.  And the MRI did not

---

[9] Docket entry # 13, pp. 18-19.

[10] *Id*. at p. 20.

[11] *Ostronski v. Chater*, 94 F.3d 413, 418 (8th Cir. 1996).

[12] SSR 96-9p: Policy Interpretation Ruling Titles II & XVI: Determining Capacity to Do Work: Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, effective date: 7/2/96.

[13] SSA record at p. 311.

support the alleged degree of limitation.  The treatment notes of attending physicians often contradict Ms. Harris's allegations of disabling back pain.[14]

Dr. Bill Payne reviewed Ms. Harris's medical records and opined that she could sit for about 6 hours in an 8-hour day.[15]  Dr. Payne also opined that Ms. Harris could occasionally stoop and crouch.[16]  This ability is consistent with the requirements for sedentary work.  The medical evidence—the treatment notes and Dr. Payne's opinion—constitutes substantial evidence[17] supporting the ALJ's RFC determination because a reasonable mind would accept it as adequate to support the determination that Ms. Harris could sit for 6 hours in an 8-hour workday, and thus work at a sedentary level.

Ms. Harris also contends that the ALJ under-estimated the effect of her bipolar disorder, but the ALJ likely over-estimated the effect of Ms. Harris's bipolar disorder. "Bipolar disorder is characterized by alternating manic episodes, in which the

---

[14]*See id*. at pp. 278 (no back tenderness on May 7, 2009); p. 263 (no back tenderness on April 15, 2010); p. 252 (no back tenderness on May 28, 2010.  *But see id*. at p. 349 (tenderness to lumbar spine on April 5, 2011).

[15] *Id*. at 300.

[16] *Id*. at p. 301.

[17]*See Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990) ("Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (internal citation omitted) .

individual feels abnormally euphoric, optimistic, and energetic, and depressive periods, in which the individual feels sad, hopeless, guilty, and sometimes suicidal."[18]  Such symptoms can impair a person's ability to do basic work activities,[19] but no evidence showed that Ms. Harris's symptoms affected her work.

Although Ms. Harris was diagnosed with bipolar disorder at age 25,[20] she later worked as a cafeteria manager for ten years.[21]  No evidence indicates that bipolar disorder interfered with her ability to perform that work.  Ms. Harris reported to the psychological examiner that she could no longer perform a later job as a waitress because of depression and mania, but she also reported getting divorced, learning her son was HIV positive, using methamphetamine, and serving probation for a driving-under-the-influence conviction[22]—all during the same time period.  These events indicate that more than depression and mania contributed to Ms. Harris's difficulties with employment.

---

[18] Maria Basile & Laura Jean Cataldo, 1 The Gale Encyclopedia of Mental Health 211 (3d ed.).

[19] *Id*. at p. 213 ("Signs of bipolar disorder may also be demonstrated outside of mental illness symptoms in behaviors such as alcohol or drug abuse, *poor work performance*, strained interpersonal relationships, or excessive promiscuity.") (emphasis added).

[20] SSA record at p. 309.

[21] *Id*. at p. 134.

[22] *Id*. at p. 310.

Significantly, treatment records showed Ms. Harris's symptoms were controlled when she took prescribed medications and abstained from using methamphetamine. For example, when Ms. Harris presented to the emergency room and reported an overdose on methamphetamine,[23] she stated that she had not been taking her psychotropic medications.[24]  When Ms. Harris applied for disability benefits, she reported few problems with the mental abilities needed to do basic work activities.[25] For example, Ms. Harris reported getting along with family, friends neighbors or others; finishing what she started; following instructions; and getting along with authority figures.[26]  She also stated that she had not been fired for not getting along with others.

During her psychological exam, Ms. Harris reported getting along well with others; loving her work as a cafeteria manager; responding satisfactorily to supervision, coworkers and work pressure; and being able to understand, carry out, and remember instructions.[27]  The examining psychologist reported that Ms. Harris responded

_____

[23]*Id*. at p. 239.

[24]*Id*. at p. 230.

[25]Examples include: "[1] Understanding, carrying out, and remembering simple instructions; [2] Use of judgment; [3] Responding appropriately to supervision, co-workers and usual work situations; and [4] Dealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b) (DIB) & § 416.921(b) (SSI).

[26]SSA record at pp. 161-62.

[27]*Id*. at p. 310.

6

appropriately to an assessment of attention and concentration capacity and that

Ms. Harris was able to perform tasks in an acceptable time frame.[28]

To the extent bipolar disorder impaired Ms. Harris's ability to work, the ALJ

limited the types of work Ms. Harris could do.  The ALJ determined that Ms. Harris

could understand, carry out, and remember simple tasks; use judgment to make simple

work-related decisions; interact with co-workers on an occasional basis; not interact

with the general public; and deal with changes in a non-varying work setting.  These

limitations are consistent with the consulting psychologist's opinion that Ms. Harris

could perform at least unskilled, simple, repetitive work with incidental interpersonal

contact and direct, concrete supervision.[29]  The restrictions sufficiently incorporated

limitations flowing from Ms. Harris's bipolar disorder.  The ALJ did not err in

determining Ms. Harris's RFC.

**Credibility**.  Because medical evidence did not substantiate Ms. Harris's

allegations, the success of her applications depended on her credibility.  The ALJ found

Ms. Harris less than fully credible.  Ms. Harris argues, however, that substantial

evidence does not support the ALJ's credibility assessment.[30]

---

[28] *Id*. at p. 312.

[29] *Id*. at pp. 329-31 (mental RFC assessment).

[30] Docket entry # 13, p. 19.

An ALJ has a statutory duty "to assess the credibility of the claimant and other witnesses."[31]  To assess Ms. Harris's credibility, the ALJ followed the required two-step process[32] and considered the required factors.[33]  Thus, the question before the court is whether substantial evidence supports the ALJ's credibility assessment.

Substantial evidence supports the ALJ's assessment.  The focus of Ms. Harris's challenge is her ability to sit.  As indicated above, there was no medical evidence in the record to indicate that Ms. Harris was unable to sit so as to perform sedentary work.  Notably, after Ms. Harris alleged she was unable to work, she sought work and did work.  At the time of her hearing, Ms. Harris worked part-time—18-25 hours per week—at a deli.  That work did not constitute substantial gainful activity, but the effort nevertheless weighs against the credibility of Ms. Harris's allegation that she could no work.

---

[31] *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992).

[32] *See Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7p (July 2, 1996).

[33] In considering the credibility a claimant's subjective complaints, an ALJ must consider: (1) the claimant's prior work record; (2) observations by third parties and treating and examining physicians relating to such matters as: (a) the claimant's daily activities; (b) the duration, frequency and intensity of the pain; (c) precipitating and aggravating factors; (d) dosage, effectiveness and side effects of medication; and (e) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

A reviewing court "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so."[34] Here, the ALJ provided good reasons for discounting Ms. Harris's credibility: (1) Ms. Harris's description of her daily activities was inconsistent with disabling limitations, (2) an agency interviewer observed no limitations, (3) Ms. Harris's treatment was routine and/or conservative in nature, (4) Ms. Harris took minimal pain-relieving medications, and (5) Ms. Harris demonstrated no debilitating symptoms at her hearing.[35]  While each factor standing alone may be challengeable, together they constitute good reason for discounting Ms. Harris's credibility.

The ALJ, however, did not find Ms. Harris incredible; instead, the ALJ found Ms. Harris partially credible and accordingly adjusted her RFC.  For example, the medical consultant opined that Ms. Harris could do medium work, but the ALJ considered Ms. Harris's complaints and reduced her RFC to sedentary.  The RFC determination reflected a reduced ability to work, but not an inability to work.  The ALJ did not err in assessing Ms. Harris's credibility.

---

[34] *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010) (citation omitted).

[35] SSA record at p. 19.

**Vocational expert testimony**.  Ms. Harris's final argument challenges the vocational expert's testimony.  Ms. Harris maintains that the testimony fell outside the boundaries of the ALJ's hypothetical question.[36]

Ms. Harris is correct about her first complaint—that the job of election clerk fell outside the parameters of the question—because that job requires contact with the general public as compared to the hypothetical question which asked about work with no contact with the public.  But that complaint does not require reversal because the vocational expert identified two other jobs—weight tester and film touch-up inspector.

Ms. Harris contends that the jobs of weight tester and touch-up film inspector exceed the reasoning level required by the question.  Relying on the Dictionary of Occupational Titles (DOT), Ms. Harris argues that the question called for jobs involving the ability to understand, carry out, and remember simple instructions, and to make simple, work-related decisions, but the jobs of touch-up film inspector and weight tester require more reasoning ability—respectively, Level 2[37] and Level 3.[38]

---

[36]Docket entry # 13, p. 21.

[37]*See* Dictionary of Occupational Titles, code 726.684-050 (requiring reasoning Level 2).

[38]*See* Dictionary of Occupational Titles, code 539.485-010 (requiring reasoning Level 3).

Level 2 reasoning requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."  Level 3 reasoning requires the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations."  Under Ms. Harris's argument, the ability to understand, carry out, and remember simple tasks, and to use judgment to make simple work-related decisions, rules out the ability to do jobs requiring Level 2 or Level 3 reasoning.

The claimant-appellant in *Meissl v. Barnhart* made a similar argument.  In rejecting the argument, the district court reasoned as follows:

> The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions.  The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking…apprehend the most abstruse classes of concepts" at level six).  To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail."  Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.[39]
>
> As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the

---

[39]*Meissl v. Barnhart*, 403 F. Supp. 2d 981, 984 (C.D. Cal. 2005).

11

job task becomes less routine.  For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables."  In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables…."[40]

As in *Meissl*, the "middle ground between these two points is…where the vocational expert identifies a job with the lowest reasoning development score that [the claimant can] perform;"[41] here, weight tester and touch-up film inspector.

At most, Ms. Harris complains about an implied or indirect conflict between the testimony and the DOT.  The conflict is direct only if the court assumes a person limited to understanding, carrying out, and remembering simple tasks, and using judgment to make simple work-related decisions, cannot apply commonsense understanding to carry-out detailed but uninvolved written or oral instructions (Level 2), or apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations (Level 3).  The ALJ did not ask the vocational expert about work requiring less than Level 2 or Level 3 reasoning.

---

[40] *Meissl*, 403 F. Supp. 2d at p. 983.

[41] *Id*.

"[A] claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range." "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities." "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT." There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs.[42]

Here, the record reflects an adequate basis for relying on the vocational expert's testimony. Ms. Harris reported having the ability to understand, carry out, and remember instructions.[43] She denied learning disabilities or educational problems.[44] She completed one year of college courses. Despite her bipolar disorder, she reported long-term occupational success[45] in a job requiring reasoning Level 4.[46]

---

[42] *Moore v. Astrue*, 623 F.3d 599, 604-05 (8th Cir. 2010) (internal citations omitted).

[43] SSA record at pp. 161-62 & 310.

[44] *Id*.

[45] SSA record at p. 310 (reporting occupational success in job as cafeteria manager and stating she got along well with others and loved working around kids).

[46] *See* Dictionary of Occupational Titles, code: 319.137-018 (manager, industrial cafeteria) (required reasoning level: Level 4).

The ALJ's hypothetical question captured the concrete consequences of Ms. Harris's impairments, and thus, was properly phrased.[47]  The vocational expert identified two responsive jobs.  The ALJ properly relied on the vocational expert's response in concluding that Ms. Harris was not disabled.  Because a vocational expert's testimony answering a properly phrased hypothetical question constitutes substantial evidence, the ALJ's conclusion is supported by substantial evidence.[48]

**Conclusion**.  Substantial evidence supports the ALJ's decision denying Ms. Harris's applications.  The ALJ made no legal error.  For these reasons, the court DENIES Ms. Harris's request for relief (docket entry # 2) and AFFIRMS the decision denying the application.

It is so ordered this 17th day of October, 2012.

_____
UNITED STATES MAGISTRATE JUDGE

---

[47] *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010) (requiring a hypothetical question to capture the concrete consequences of the claimant's impairments).

[48] *Accord Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011).